IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 18, 2018

## STATE OF TENNESSEE v. ROBERT ANTWAN MCELMURRY

**Appeal from the Circuit Court for Dyer County**
**No. 14-CR-106     R. Lee Moore, Jr., Judge**

_____

### No. W2018-00360-CCA-R3-CD

_____

The Defendant, Robert Antwan McElmurry, was convicted by a Dyer County Circuit Court jury of aggravated statutory rape, a Class D felony, and was sentenced to eight years in the Department of Correction. On appeal, he argues that the evidence is insufficient to sustain his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

James E. Lanier, District Public Defender; Sean P. Day, Assistant Public Defender, Dyersburg, Tennessee, (on appeal); and Milly Worley, Dyersburg, Tennessee, (at trial), for the appellant, Robert Antwan McElmurry.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Danny Goodman, Jr., District Attorney General; and Karen Burns, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Defendant, who was 33 years old at the time of trial, was indicted and convicted of aggravated statutory rape arising out of his sexual involvement with the victim, who was 16 years his junior. The evidence presented at his April 20, 2017, trial is recounted below.

## State's Proof

Betty Hicks, the records clerk at the Dyer County Jail, testified that the Defendant's date of birth was June 26, 1984, and that he would be 34 years old on his next birthday.

Officer Vella Denny of the Dyersburg Police Department testified that she was asked to interview the 13-year-old victim in March 2014. She met with the victim and the victim's mother regarding an alleged rape. Officer Denny said that the victim was shy, and it was not easy to interview her. The victim identified the Defendant as the suspect during the interview.

The victim testified that she was born on August 17, 2000. At the time of the incident, she was 13 years old and in the sixth or seventh grade. The victim had previously met the Defendant at her sister's apartment. The victim said that she visited her sister's apartment every other weekend.

The victim testified that she spent the night at her sister's apartment on February 14, 2014. The Defendant was also there that night. The victim said that whenever she spent the night with her sister, she slept on the floor, and her sister slept in her upstairs bedroom. The victim recalled that she fell asleep at some point, but she woke up when the Defendant "got on top of [her]." She said that the Defendant got on top of her, pulled her pants down, and "put his private part inside of [hers]." She did not tell him to stop because she did not know what to say. After the Defendant finished, he told her not to tell anyone. The victim stated that she had never had sexual intercourse before this time.

The victim testified that she did not tell anyone what the Defendant had done until sometime later when she was watching a television show with her mother about a rape, and she told her mother what the Defendant had done to her. She and her mother went to the police department and spoke with a female officer.

On cross-examination, the victim testified that she was diagnosed with three sexually transmitted diseases ("STDs"), which she contracted from the Defendant. On redirect, she recalled that she saw a doctor on March 25, 2014, which was about six weeks after the incident with the Defendant. She maintained that she had never had sexual contact or intercourse with anyone before the encounter with the Defendant.

The victim's older sister testified that the victim spent the night at her apartment on February 14, 2014. She recalled that the victim fell asleep on the floor in the living room between 8:00 and 10:00 p.m. During the course of the evening, people were coming and going from her apartment, including her boyfriend, her brother, and the

Defendant. The Defendant came to her apartment around 8:30 or 9:00 p.m. The victim's sister explained that the Defendant's girlfriend lived two apartments down and that he was often in the area. She said that the Defendant sometimes came to her apartment because he knew her other sister's boyfriend.

The victim's sister testified that on the night of the incident, the Defendant came to her apartment and said that the police were following him. He said that he needed to sober up, and his girlfriend would not allow him in her apartment because they had been arguing. The Defendant's speech was slurred, and he was wobbly. He was carrying a water bottle containing vodka. When the victim's sister went upstairs to bed, the victim was on the floor in the living room, and the victim's sister's brother and the Defendant were sitting on the couch.

The victim's sister testified that she later learned from her mother what had happened to the victim that night. Her mother asked her to call the Defendant and put him on a three-way call. When the Defendant answered the phone, she asked him if he had raped the victim. The Defendant responded, "My dick is big and she is small." He did not deny raping or having sex with the victim.

The victim's mother testified that she noticed a change in the victim's demeanor in February or March of 2014. Sometime in March 2014, she and the victim were watching a crime drama on television, and the episode was about a young girl who had been raped. The victim started crying, and the victim's mother asked her what was wrong. The victim replied that nothing was wrong, and the victim's mother asked, "Has somebody messed with you?" The victim shook her head affirmatively and then told her mother what the Defendant had done to her.

The victim's mother testified that she called the victim's sister and asked that she make a three-way call to the Defendant. The victim's mother asked the Defendant, "What did you do to my daughter?" The Defendant told her, "Ma'am, the only thing I can tell you is I got a big . . . dick. She's small." The Defendant never denied having sex with the victim. After that phone call, the Defendant repeatedly called her asking that she not call the police. The victim's mother, however, took the victim to the police station for an interview and thereafter for a physical examination. The victim's mother said that the victim was diagnosed with STDs and treated with medication.

**Defendant's Proof**

The Defendant testified the he and the victim's sister previously had a sexual relationship. On the night in question, he went to the victim's sister's apartment because she called and asked him to stop by and check on her sisters. He did not recall the victim

- 3 -

making a pallet on which to sleep on the floor, and he denied that he got on top of her, removed her clothes, or touched her inappropriately. He also did not recall what time he left the victim's sister's apartment on the night in question. With regard to the three-way call that took place between himself and the victim's mother and sister, the Defendant said that he specifically told them that he did not have sex with the victim and denied making any remarks about being large and the victim being small.

The Defendant testified that he was tested for STDs in December 2014, and the results were negative for chlamydia and gonorrhea. When asked whether he had ever been treated for any kind of STD, the Defendant answered, "Not during that time frame, no." However, he was treated for a urinary tract infection in the first part of 2014, but that had nothing to do with an STD. The Defendant again maintained that he did not touch the victim in an inappropriate manner or have sex with her.

On cross-examination, the Defendant conceded that he was tested for STDs ten months after the night in question. He denied receiving treatment for any STD during the time period between the alleged offense and when he was tested 10 months later. However, he admitted to taking an antibiotic for a toothache in July 2014. He also recalled that the urinary tract infection for which he was treated was in February 2014.

Shari Tidwell, a nurse practitioner, performs medical treatments at the Dyer County Jail. Nurse Tidwell stated that Keflex was not used for the treatment of chlamydia; Doxycycline and Zithromax were the drugs typically used to treat it. She said that Septra, Bactrim, and Rocephin were likely choices for treating a urinary tract infection, and those are "not protocol treatment for chlamydia." She had never read anything that indicated any of the drugs the Defendant was prescribed would have an effect on chlamydia, and she did not see anything in her notes where the Defendant was prescribed something that would typically be used to treat it.

On cross-examination, Nurse Tidwell admitted that chlamydia is a bacterial infection, and Keflex is an antibiotic. She also admitted that urinary tract infections are normally treated with antibiotics. She acknowledged that antibiotics other than the protocol drugs she mentioned can cure chlamydia, and she did not know whether any of the drugs the Defendant was prescribed might have the incidental effect of doing so.

Following the conclusion of the proof, the jury convicted the Defendant as charged of aggravated statutory rape.

## ANALYSIS

- 4 -

The Defendant challenges the sufficiency of the convicting evidence, arguing that he could not be guilty of aggravated statutory rape because "[t]he evidence is . . . undisputed that [he] did not have a sexually transmitted disease[,] . . . [and] [t]he evidence is also undisputed that [the victim] had multiple sexually transmitted diseases, such as chlamydia."

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting

State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

Aggravated statutory rape is "the unlawful sexual penetration of a victim by the defendant, or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least ten (10) years older than the victim." Tenn. Code Ann. § 39-13-506(c). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7).

In the light most favorable to the State, the evidence shows that the 29-year-old Defendant got on top of the 13-year-old victim while she was asleep on the living room floor in her sister's apartment, pulled her pants down, and "put his private part inside of [hers]." After penetrating the victim, the Defendant told her not to tell anyone. The testimony at trial showed that the victim's demeanor changed after the incident with the Defendant, and upon watching a television show in which a young girl was raped, the victim became upset and told her mother what the Defendant had done to her. When confronted by the victim's mother and sister, the Defendant said, "I got a big dick. She's small" but did not deny that he had raped her. From this evidence, a rational trier of fact could find that the Defendant sexually penetrated the victim and that the victim was between the ages of 13 and 18, and the Defendant was 10 years older.

The Defendant contends that he could not be guilty of aggravated statutory rape because the victim was diagnosed with an STD and testing revealed that he did not have one. However, the evidence indicated that the Defendant was not tested for an STD until 10 months after the incident and had taken various medications during the interim that could have had the incidental effect of curing an STD. Moreover, our supreme court has concluded that the testimony of a child victim, alone, is sufficient to sustain a conviction." State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003). Any doubts regarding the victim's testimony or other discrepancies in the proof were resolved by the

jury as the trier of fact. There is sufficient evidence to support the Defendant's conviction for aggravated statutory rape.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE